## STERLING MILK PRODUCTS CO., etc. v. O. K. CO-OPERATIVE MILK ASS'N, Inc.

No. 27857. Nov. 1, 1938.

Rehearing Denied Nov. 29, 1938.

Snyder & Lybrand. for plaintiff in error

Lee B. Thompson, for defendant in error.

BAYLESS, V. C J. This is an appeal from the district court of Oklahoma county. O. K. Co-operative Milk Association, Inc.. a corporation, sued Sterling Milk Products Company, a division of the Beatrice Creamery Company, a foreign corporation. The defendant cross-petitioned. This is a law action, but a jury was waived, and the judgment of the court was for the plaintiff.

The plaintiff is a nonprofit corporation organized under the laws of Oklahoma by the milk producers of the Oklahoma City area, and the benefits or profits derived from its operations inure to the members It receives all of the fluid milk its members produce, and with this milk it supplies much of the fluid milk market of Oklahoma City. Such of this milk as it is unable to thus dispose of it processes at its surplus plant at Oklahoma City. Fluid milk commands a better price than the by-products processed from it. Therefore, it is to its

advantage to sell as much of its milk in so-called fluid state as possible.

The defendant is a commercial corporation engaged in the sale of fluid milk and certain of its by-products, not processed as plaintiff processes its milk, in Oklahoma City. It is natural for it to endeavor to sell as great a volume of this merchandise as it can. Its principal source of supply of fluid milk is from certain independent dairies in the Oklahoma City area. These dairies are not members of the plaintiff organization, and are referred to by the parties as nonmembers to differentiate them from plaintiff's producers, who are referred to as members. Apparently all of the milk furnished defendant by these nonmembers is and has been insufficient to supply its demand.

June 30, 1931, plaintiff and defendant entered into a contract whereby plaintiff bound itself to sell defendant certain fluid milk. This contract remained operative until September 15, 1932, when the parties amended it in certain respects. This amended contract remained operative until February 28, 1934, when it was terminated by the parties. The claims of both parties arise from their varying interpretations of the amended contract.

The plaintiff alleges that defendant was obligated to purchase 40 per cent. of its annual needs from plaintiff, that it failed to do so as exhibited by an account attached, and sought judgment for $1,891.99. The defendant admitted this obligation, but alleged that plaintiff was obligated to take defendant's surplus milk to process, but refused so to do, whereby defendant was relieved of its obligation to take the 40 per cent., and denied any liability to plaintiff; and it then set out the loss it sustained by reason of plaintiff's refusal to take defendant's surplus milk and sought judgment for $3,890.17

The controversy turns on the meaning of "surplus," as used in the amended contract. The first contract was amended as to sections 4, 6, and 7. It is the amendments to section 7 that are involved. Paragraphs 1 and 3 were altered. Paragraph 2 was left unchanged. Since 1 and 3 were amended by additions to the original language, it is possible to quote sections 1, 2, and 3, as amended, and consider them in the light of the amendments, which are emphasized:

"1. Hereto attached, marked Exhibit A and made a part of this contract is a statement showing the nonmembers, which is to conform to the 'Exhibit A' attached to the original contract as of June 30, 1931, and it is agreed that the purchaser may continue to purchase milk from these nonmembers, or from a like number of nonmembers, but the purchaser agrees not to increase the number of nonmembers from whom he purchases or may purchase milk, and it is agreed that the purchaser will on the 30th day of each month furnish the association a list of any customers of the nonmember class acquired by the purchaser during such month, together with a like list showing the nonmember customers lost by the purchaser during such month. **It is further agreed that the purchaser will purchase at least 40% of his fluid milk supply from the association. Said percentage is to be computed on a yearly basis.**

"2. It is agreed that the performance of this contract under the circumstances existing in the market operates to divide milk to be delivered to the purchaser into two classes, to wit: Class '1' is milk delivered to the purchaser with the surplus quality eliminated, a high standard quality, a stable and pooled quality, with an accounting service performed by the producer, and with a testing service rendered. Such class '1' milk is the milk to be delivered by the association under this contract. Class '2' milk is milk which is delivered to the purchaser by individuals; it includes the surplus quanity (sic) and does not include the additional elements of service in the way of accounting, grading, and testing which distinguishes class '1' milk as herein described Such class '2' milk is the milk delivered by individuals who make deliveries to the purchaser in the manner as heretofore done by the customers enumerated on 'Exhibit A' hereto attached.

"3. It is further understood that the association operates a surplus plant and renders the service to the purchaser enumerated as distinguishing class '1' milk from other milk, and that service so to be rendered is necessary in the processing and marketing of milk in Oklahoma City, Oklahoma. It is further agreed that class '1' milk has a greater value to the purchaser than class '2' milk, said difference in value being the cost of rendering the service which distinguishes class '1' from class '2' milk. It is further agreed that the association will operate on a nonprofit basis, and it is agreed that the purchaser will not pay a greater price to individual customers who deliver class '2' milk than the association pays its individual members; **It is also agreed that the purchaser shall pay to the association upon the milk of nonmembers a sum per pound butterfat equal to the difference between the price paid the association for milk by said purchaser and the price the association pays its members; and the money so received will be additional income and that the money received will be additional income and in-**

cluded in the following pool settlement. It is understood that such difference is generally considered the cost of handling surplus and to the association is considered as a service charge. It is understood that the association has provided a surplus plant whereby the burden of surplus is removed from the purchaser and the nonmembers and assumed by the association. In consideration of the agreement of the purchaser to pay the said sum for said service the association agrees to take care of the surplus as well as the shortage resulting from the irregularities in supply furnished by these nonmembers. Said sum is to be paid on the 4th and 19th days of each month for the previous period."

The controversy over the interpretation of these amended sections arose within two or three weeks after the date of operations under it. These differences continued until the termination of the contract. It seems that the producers, members and nonmembers within a given area arranged for the delivery of milk by trucks. Some of these trucks served producers of one group only, while others seemed to have served both groups. The nonmembers doing business with defendant were listed, and it was recognized in the contracts that defendant was obligated to take all of the milk tendered by these nonmembers, and it was likewise recognized that the amount to be furnished by the plaintiff was designed to fill the gap between the supply of nonmembers and the demands of defendant's business All nonmembers delivered their milk to defendant. The defendant then told plaintiff how much milk it desired plaintiff to furnish it daily, and changed this amount from time to time to suit its needs. The plaintiff, having knowledge of defendant's needs, directed certain of its trucks to deliver their milk to defendant directly. Defendant kept account of this milk and settled twice monthly for it. We suppose that this daily supply from plaintiff was designed to constitute on an annual average 40 per cent. of defendant's supply.

Owing to fluctuations in the amount of milk supplied by nonmembers, and likewise to the varying daily demands of defendant's business, it was sometimes necessary for defendant to reject some of the milk supplied by plaintiff, and, according to practice, any day the defendant notified plaintiff of its intention to decline to receive certain of the plaintiff's proffered milk, the plaintiff acquiesced and received the milk into its plant. Plaintiff contends this constitutes the surplus mentioned in the contract.

It seems that however closely defendant estimated its daily needs, nevertheless almost daily it had left on its hands milk which it had not sold and could not thereafter sell because of city ordinances. It contended that this was the surplus mentioned in the contract The plaintiff said not and refused to take it.

As said, the differences over the word "surplus" make the suit. The plaintiff says the surplus specified meant that milk offered to the defendant and not received by defendant because in excess of its estimated needs. The defendant says this is "oversupply" milk, and that the surplus is what it has left unsold and unsalable. Each introduced witnesses to testify as to the meaning of these terms in the trade.

The trial judge found for the plaintiff, which means that he interpreted the amended contract as the plaintiff interpreted it. Thereby the theory of defendant's cross-petition was destroyed. In so doing we believe that he interpreted it correctly.

The language of the contract defines the surplus as follows: "* * * the surplus * * * resulting from irregularities in supply furnished by these nonmembers." The defendant's position was much worse than plaintiff's. The plaintiff may have had continually a surplus of milk of its members, but it had a processing plant to care for it so that it did not become a total loss. The defendant had a fairly constant sale and a source of supply wholly insufficient. Whether it needed as much as 40 per cent. of its supply from plaintiff, defendant insists that plaintiff held the upper hand in setting the terms of the contract and forced defendant to sign a contract not entirely to its liking By this amendment the plaintiff agreed to care for not only the surplus, as defined above, but the shortage as well. It was the defendant's needs which were to be remedied and not plaintiff's.

It may almost be said that the two organizations were antagonistic in their purposes. This is made to appear in the evidence and in the briefs The plaintiff by appropriate provisions limited the number of nonmembers from whom defendant could take milk to that existing at the time of the contract. It appears that plaintiff was in a position to dictate rather than be dictated to. With these views in mind, the

argument of defendant loses much of its reason. To say that plaintiff was obligated to take back from defendant unsold milk, which defendant had purchased, offered for sale, and had left on its hands, would make plaintiff the underwriter of defendant's business. Not only would plaintiff be insuring defendant a source of supply, but it likewise would be insuring it against loss from merchandise not sold. This view of the matter makes defendant's contention utterly untenable.

The differential mentioned in the contract and discussed at length in the defendant's brief was the consideration for plaintiff receiving the surplus for nonmembers, and was designed to bring price levels up to those maintained by the plaintiff and its members and to prevent defendant making a profit on the surplus it turned to plaintiff, arising from any difference between the cost of fluid milk and the return on the processed surplus.

We now take up a consideration of the plaintiff's cause of action as disclosed by the evidence.

Over the period of months during which this amended contract operated, defendant purchased milk from the two mentioned sources only, and its total of purchases of butter fat was 748,547.94, and 40 per cent. of this total is 299,419.18 lbs. Defendant purchased from plaintiff 207,906.94 lbs, so that it actually failed by 91,512.24 lbs. to purchase the required 40 per cent. Plaintiff then showed the difference between the processed products sale price and the fluid milk price, and the total difference is $7,914.55.

Defendant objects strenuously to this method for two reasons. It says that this is not the proper method of ascertaining the damages for a breach of contract to buy. Section 9974, O. S 1931 (23 Okla. Stat. Ann. sec. 32), and section 9995, O. S. 1931 (23 Okla. Stat. Ann. sec. 91). It is clear from all of the record that there was no sale for all of the fluid milk, as such, brought to Oklahoma City market daily. The parties frankly recognize this in their contract. and defendant proves it by its showing of the unsold and unsalable milk left on its hands. Plaintiff showed by the record that it used diligence and good faith in processing this milk and getting the best price for this milk in its next most salable form. In our opinion, this sufficiently meets the measure laid down in the statutes cited. Secondly, defendant argues that it is at the mercy of plaintiff with respect to

the cost of processing, and that the cost of processing may or may not be reasonable, depending upon the practices of plaintiff. This argument loses its force in view of the fact that defendant contracted with plaintiff to process the surplus milk of nonmembers. Any assumption of inefficiency or unfair costs in this respect virtually convicts defendant of voluntarily contracting with respect to surplus milk with full knowledge of such contingency. It does not appear reasonable for the defendant to complain of the use of such figures to determine its liability for its breach of the contract to purchase milk, when it has. adopted such figures to determine the rate of return to it for the handling and sale of its surplus milk.

Defendant next argues that the obligation on its part to purchase annually at least 40 per cent. of its needs from plaintiff is offset or automatically canceled by plaintiff's obligation to handle defendant's surplus milk. Defendant says that if over a period of one year its nonmember source of supply delivered 75 per cent. of its needs (and it is admitted it was obligated to take all of this), and plaintiff delivered to it 40 per cent., it would automatically result in a proffered surplus of 15 per cent., which the plaintiff was in turn obligated to receive and process. Why, says the defendant, should it be required to take this 15 per cent. surplus simply to comply with its contract, when it could at the same instant demand that plaintiff keep it and process it as a surplus for defendant?

This argument would be good if the parties had agreed that the 40 per cent sold by plaintiff to defendant, and the surplus taken back by plaintiff to process for defendant. were to be paid for on the same basis. The fluid milk defendant was obliged to buy from plaintiff was to be paid for on a sliding scale determined by the market price of fluid milk. It was agreed that the price of fluid milk—its value—was always more than the value of its by-products after processing. The surplus was to be paid for by virtually making defendant a member of the pool. In other words, defendant received for this surplus the value of its by-products less a pro rata share of the expense of operating the association's plant. As shown above. this was less than the price of fluid milk.

We are impressed with the plaintiff's account and the figures adopted therefrom by the trial court in rendering judgment for plaintiff.

Judgment affirmed.

OSBORN, C. J., and WELCH, HURST, and DAVISON, JJ., concur.